# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MELISSA DAWN CHRISTENSEN,   )
                                   )
        **Plaintiff,**          )
                                   )
                                   )     **Civ. 12-131 Erie**
                                   )
MICHAEL J. ASTRUE,           )
COMMISSIONER OF SOCIAL     )
SECURITY,                     )
                                   )
        **Defendant.**        )

## OPINION

### I. Introduction

This case is before us on appeal from a final decision by the defendant, Commissioner of

Social Security ("the Commissioner"), denying Melissa Dawn Christensen's claim for disability

insurance benefits and supplemental security income under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 401-434 and 1381-1383f. The parties have submitted cross-motions

for summary judgment. For the reasons stated below, we will grant the Plaintiff's motion for

summary judgment to the extent she seeks a remand for further proceedings, deny Plaintiff's

motion for summary judgment to the extent she seeks a reversal of the ALJ's decision and an

award of benefits, and deny the Defendant's motion for summary judgment.

### II. Procedural History

Melissa Dawn Christensen applied for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42

U.S.C. §§ 401-434 and 1381-1383f on February 18, 2009, alleging a disability due to depression,

back problems, and foot problems, with an alleged onset date of December 29, 2008. Plaintiff's

claim was initially denied on June 8, 2009. A timely request for a hearing was filed by Plaintiff

on June 26, 2009. A hearing was held before an Administrative Law Judge ("ALJ") on August 12, 2010, at which Plaintiff was represented by counsel, Gerald M. Sullivan, and testified. R. at 36-67. A vocational expert also testified at the hearing. R. 67-71.

By decision dated September 17, 2010, the ALJ determined that Plaintiff is not disabled under §§ 216(i), 223(d) and 1614(a)(3)(A) of the SSA. R. at 18-28.

Plaintiff filed a timely review of the ALJ's determination, which was denied by the Appeals Council on April 10, 2012. R. 1-6. Having exhausted her administrative remedies, Plaintiff filed the instant action seeking judicial review of the final decision of the Commissioner of Social Security denying her DIB and SSI application.

**III. Standard of Review.**

The Congress of the United States provides for judicial review of the Commissioner's denial of a claimant's benefits. See 42 U.S.C. § 405(g)(2012). This court must determine whether or not there is substantial evidence which supports the findings of the Commissioner. See id. "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate.'" Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). This deferential standard has been referred to as "less than a preponderance of evidence but more than a scintilla." Burns v. Barnhart, 312 F.3d 113, 118 (3d Cir. 2002). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. See id.; Fargnoli v. Massonari, 247 F.3d 34, 38 (3d Cir. 2001) (reviewing whether the administrative law judge's findings "are supported by substantial evidence" regardless of whether the court would have differently decided the factual inquiry). So long as the ALJ's decision is supported by substantial evidence

2

and decided according to the correct legal standards, the decision will not be reversed. Id. To

determine whether a finding is supported by substantial evidence, however, the district court

must review the record as a whole. 5 U.S.C. § 706(1)(F)(2012).

**IV. ALJ Decision.**

Under the SSA, the term "disability" is defined as the:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months ...

42 U.S.C. § 423. A person is unable to engage in substantial activity when he:

is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work....

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

In determining whether a claimant is disabled under the SSA, a sequential evaluation

process must be applied. 20 C.F.R. § 416.920(a). See McCrea v. Commissioner of Social

Security, 370 F.3d 357, 360 (3d Cir. 2004). The evaluation process proceeds as follows. At step

one, the Commissioner must determine whether the claimant is engaged in substantial gainful

activity for the relevant time periods; if not, the process proceeds to step two. 20 C.F.R. 20

C.F.R. § 416.920(b). At step two, the Commissioner must determine whether the claimant has a

severe impairment or a combination of impairments that is severe. 20 C.F.R. § 416.920(c). If

the Commissioner determines that the claimant has a severe impairment, he must then determine

whether that impairment meets or equals the criteria of an impairment listed in 20 C.F.R., part

404, Subpart P, Appendix. 1. 20 C.F.R. § 416.920(d).

The ALJ must also determine the claimant's residual functional capacity; that is, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 416.920(e). If the claimant does not have an impairment which meets or equals the criteria, at step four the Commissioner must determine whether the claimant's impairment or impairments prevent him from performing his past relevant work. 20 C.F.R. § 416.920(f). If so, the Commissioner must determine, at step five, whether the claimant can perform other work which exists in the national economy, considering his residual functional capacity and age, education and work experience. 20 C.F.R. § 416.920(g). See also McCrea, 370 F.3d at 360; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

In the instant matter, in support of his Decision, the ALJ first focused on those records relevant to Plaintiff's obesity and back pain. He discussed the medical records from Plaintiff's primary care providers to the extent they contained a diagnosis of obesity. R. 21. He then discussed Plaintiff being diagnosed with lumbago and that although she was referred to physical therapy for her back, and testified that she went to therapy and it made her back pain worse, so she stopped attending therapy, there was not any evidence in the medical record that she ever attended physical therapy. R. 21. Next, the ALJ discussed Plaintiff's testimony that she'd had x-rays that showed narrowing of the spine, and that a January 12, 2009 x-ray of Plaintiff's lumbar spine noted mild posterior element sclerosis at L5-S1 but no evidence of acute fracture, malalignment, or significant degenerative change. R. 21. The ALJ further noted that there were no real positive findings on Plaintiff's back impairment in the Record, that treatment records regularly reflected that there was no known injury, that no objective testing had established the etiology of Plaintiff's back pain, and although she had received treatment for her complaints of

back pain, the treatment had been excessively conservative in nature. R. 21. Based on all of the above, the ALJ concluded that "the evidence of record fails to establish that [Plaintiff's] back impairment causes more than a minimal limitation on [her] ability to perform basic work activities" and '[i]t is therefore, nonsevere under Social Security Regulations." R. 21.

The ALJ next focused on the evidence of record, both medical and non-medical, with respect to Plaintiff's mental health impairments. The ALJ first discussed Plaintiff's activities of daily living and found that she "has no restriction." In support thereof he noted:

> [she] is the sole provider of care for her two-year-old son. [She] testified that she drives 45 minutes to her mother's house every other weekend. She reports that she cares for her son, cleans her house, cooks, and takes care of her dog. She cares for her personal needs, and does laundry, dishes, and yard work. She does errands on a daily basis and is able to go shopping in stores alone. Claimant reports hobbies that include sewing, playing games, horses, and watching television, although she indicates that she does not engage in them as frequently as she used to due to her depression.

R. 22. The ALJ also referenced the conclusion of state agency psychologist Manella Link ("Dr. Link") that Plaintiff had no restriction in the area of activities of daily living. R. 22. Concerning activities of daily living, thus, the ALJ concluded: "[t]he evidence of record, taken as a whole, supports a finding that [Plaintiff] has no restrictions in this domain." R. 22 (citations omitted)

The ALJ next discussed Plaintiff's social functioning and found that she has "moderate difficulties:"

> [She] testified that she gets irritable if people talk to her and she lashes out at them. [She] reports that she does not spend time with others and that she does not normally go anywhere. This is contradictory to her testimony, however, that she has a close friend who is an almost constant companion and her report that she does errands on a daily basis. Additionally, she maintains some sort of an agreeable relationship with her husband. Furthermore, she is able to go shopping in stores alone. Although [she] reports that she does not engage in social activities anymore, she reports no problems getting along with family, friends,

5

neighbors, authority figures, or others, and she has never lost a job because of problems getting along with other people.

R. 22 (citations omitted). The ALJ also referenced state agency psychologist Dr. Link's conclusion that Plaintiff had no difficulties in maintaining social functioning. R. 22. The ALJ concluded that "the preponderance of evidence in this case favors a finding that [Plaintiff] has moderate difficulties in this category. " R. 22.

The ALJ next discussed Plaintiff's "concentration, persistence, and pace" and concluded that in this area she has moderate difficulties:

> [Plaintiff] testified that she has a hard time concentrating and that she will start things and forget to finish them. [She] reported experiencing difficulty with memory, completing tasks, and concentration. She stated that she can only pay attention for ten minutes. She reported a poor ability to follow written instructions, although she indicated she can follow spoken instructions fairly well. She testified, however, that she is taking two online college courses in which her grades are As and Bs.

R. 22 (citations omitted). The ALJ also referenced Dr. Link's conclusion that Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace." R. 22. (citation omitted)

The ALJ also concluded that Plaintiff had not had any episodes of decompensation which have been of extended duration. R. 22. In support of this conclusion, the ALJ noted:

> [Plaintiff] has no record of psychiatric emergency room or inpatient hospitalizations. There is no evidence that [she] has experienced the kind of acute symptomatology associated with what is considered an episode of decompensation. There is no clinical evidence of acute psychosis, suicidal intent, or homicidal ideation. [She] is capable of functioning independently outside of her home.

R. 22. The ALJ further noted that Dr. Link had also found that Plaintiff had not experienced any episodes of decompensation. R. 22 (citation omitted).

6

The ALJ also concluded that "[t]he record does not show a chronic affective disorder persisting for two or more years, despite pharmalogical treatment, resulting in 'repeated' episodes of decompensation, or acceptable medical evidence supporting a prospective opinion that the [Plaintiff's] mental status would deteriorate if she were required to perform a minimum increase in mental demands, or a current history of one or more years of an inability to function outside a highly supportive living arrangement." R. 23.

The ALJ then decided, "after careful consideration of the entire record, I find that the [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except that she is limited to simple tasks requiring little or no judgment; no interaction with the public, although the public could be around but no interacting required; and only occasional interaction with coworkers." R. 23. In so concluding, the ALJ stated: "[Plaintiff] testified that she is unable to perform the basic requirements of work activity because of the stressors of dealing with depression and that she is unable to do much of anything. She becomes irritable when other people talk to her. She is unable to concentrate, does not like being around other people, and is unable to keep up, according to her testimony. She reports loss of memory, lack of concentration, and crying all the time as factors which limit her ability to engage in work-like activities, and states that doing a job would be difficult because her thoughts become preoccupied with problems in her personal life outside of work." R. 24 (citation omitted).

The ALJ then made the following conclusion with respect to Plaintiff's credibility: "after careful consideration of the evidence, I find that the [Plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the

7

[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 24. In support of this credibility determination, the ALJ cited first to the fact that Plaintiff has been receiving unemployment benefits since January 2009, which means she "is representing to the state she is willing and able to work. While entitlement to unemployment benefits and a finding of disability under the Social Security Regulations are not mutually exclusive, the inherent inconsistency is not without significance." R. 24. Second, the ALJ noted an inconsistency between Plaintiff's explanation for why she stopped working in December 2008 and what was in the Record. "Although [Plaintiff] reported that she lost her job due to her inability to concentrate at work, the record indicates that the claimant left her job because her child was being returned to her by social services." R. 24. Third, the ALJ stated: "[Plaintiff] testified that the child was taken by social services at the hospital because of issues in her husband's past of which she was unaware. However, the record reflects that in May 2006, over a year before the child was born, she was, in fact, aware of the situation." R. 24 (citations omitted). Fourth, the ALJ noted: "[h]er testimony that she does not believe that she could perform her past work as a housekeeper now because of stressors with her family and husband is inconsistent with the basic principle of disability under our rules. If the barrier to a claimant's employment is something other than functional limitations caused by a claimant's impairment(s), then that claimant is not disabled under Social Security Regulations." R. 24. Finally, the ALJ explained that there was an inconsistency between Plaintiff's testimony that she does not like to leave her house and the fact that every other weekend she drives to her mother's house which is located 45 minutes away. R. 24.

8

The ALJ next evaluated Plaintiff's depression. He noted:

> up until very recently [Plaintiff] received treatment for this condition only through her primary care provider who treated her conservatively with psychotropic pharmacotherapy. She only recently began individual counseling, although she alleged experiencing depressive symptoms since 2000. Even so, her condition regularly seems to be improving, although there has been a slight deterioration when the medication was changed and apparently was not helpful to [Plaintiff].

R. 24 (citations omitted). The ALJ then stated:

> [a]lthough the severity of her symptoms does fluctuate, the overall treatment record reflects a fairly well-controlled condition that is responding reasonably well to medication. In November 2009, she reported feeling great and expressed that things were looking up. In February 2010, she reported that she was unable to sleep, and that she was experiencing intensified anxiety. Her most recent treatment note of record [from August 4, 2010] indicates that her sleep had improved and her anxiety was decreased, although she was still experiencing irritability and racing thoughts. Prior to that, it was noted that she had discontinued attending her individual counseling sessions for a couple of months.

R. 24 (citations omitted). The ALJ also noted that Plaintiff's treatment providers appeared to still be adjusting her medications in an effort to achieve optimum improvement. R. 25 (citation omitted). He further explained that while Plaintiff states that her depression causes her not to want to leave her house, the evidence of record does not support this statement: the record indicates that she goes out daily for errands, shops in stores, and travels 45 minutes each way to visit her mother on a bi-weekly basis. R. 25. Ultimately, the ALJ concluded that with respect to Plaintiff's depression: "[o]verall, the preponderance of the evidence does not support that this condition causes the severity of functional limitations that would support a finding that [the Plaintiff] is unable to engage in any form of substantial gainful activity as a result of her depression. The above defined residual functional capacity assessment adequately accounts for the credibly established limitations attributable to claimant's depression." R. 25.

9

The ALJ then turned to Plaintiff's claims that "she has difficulty concentrating, problems with her memory, and an inability to complete tasks and noted that "[t]he record reflects a probable diagnosis of ADHD." R. 25. The ALJ noted that Plaintiff reported to her treatment providers that she has difficulty with concentration and remembering things, but that she currently did not take medication for ADHD. R. 25. The ALJ also noted that "other than her subjective reporting, the record is devoid of any findings to substantiate [her] protestations of decreased concentration, memory loss, and task incompletion. Tellingly she has been enrolled in an online college program and, by all indications, has been performing satisfactorily, receiving As and Bs. This activity is inconsistent with her allegation that she has difficulty concentrating on anything." R. 25. Thus, the ALJ concluded: "[b]y limiting [Plaintiff] to simple tasks requiring little or no judgment, the limitations resulting from her ADHD are sufficiently accommodated." R. 25.

The ALJ then turned to the opinion evidence contained in the Record. He started with the opinion evidence of Mary Evelyn Pifer, RPA-C. R. 25. Ms. Pifer had checked a box on a medical assessment form which indicated that Plaintiff suffered from a "temporary incapacity," defined as a "physical or mental condition [which] precludes him/her from participating in ANY FORM of employment or training activity at this time, but the condition is expected to improve," that this condition prevented her from working as of December 29, 2008, and that her temporary incapacity was expected to keep her "from working or participating in training for 20 or more hours per week" until June 29, 2009." R. 229. The ALJ also noted that on January 7, 2009, Ms. Pifer indicated that Plaintiff was currently unemployed due to medical conditions. R. 25. The ALJ then concluded that while he had considered Ms. Pifer's opinion consistent with SSR 06-3p,

10

he had given Ms. Pifer's opinion evidence little weight "because the basis for Mr. Pifer's determination is unknown as there is no accompanying explanation, only generic diagnoses, the opinions are against the weight of the medical evidence of record, and the determination of disability does not meet the 12-month durational requirement for a finding of disability under Social Security Regulations." R. 25. The ALJ also noted that "[m]oreover, an opinion that a claimant is disabled or unable to work is an issue reserved to the Commissioner" and that "Ms. Pifer is not an acceptable medical source under 20 CFR 404.1513 and 404.913." R. 25.

The ALJ then discussed the opinion evidence from Paul Fox, M.D., a state agency physician who had reviewed Plaintiff's records with respect to her alleged physical impairments. The ALJ noted that Dr. Fox had reviewed the evidence in Plaintiff's file and concluded that she retained "retained the ability to occasionally lift or carry 20 lbs., and frequently lift or carry 10 lbs., that she could stand or walk about 6 hours in an 8-hour workday, that her ability to sit was unlimited, and that her ability to push and pull was limited to the same extent as her ability to carry," and that she had limitations in performing postural maneuvers as well. R. 25. The ALJ then concluded that he afforded Dr. Fox's opinion "little weight, as the limitations he has ascribed to claimant's ability to lift or carry, stand or walk, and perform postural maneuvers is inconsistent with the overall evidence of record, including Dr. Fox's own report." R. 25. In support thereof, the ALJ stated:

> Dr. Fox notes in his assessment that [Plaintiff] frequently had no musculoskeletal complaints during treatment with her primary care providers, that there was at least one negative straight leg raise test of record, and the routine and conservative nature of the treatment for [Plaintiff's] lumbago. The above finding that [Plaintiff's] lumbago is a nonsevere impairment under Social Security Regulations is a more accurate assessment of [Plaintiff's] current status considering the totality of the evidence of record."

11

R. 25-26 (internal citation omitted).

The ALJ next discussed the opinion evidence of Dr. Link with respect to Plaintiff's mental impairments:

> Dr. Link determined, based upon his review of the evidence of record, that [Plaintiff's] basic memory processes are intact, she is able to get along with others, and she is able to make simple decisions. Dr. Link noted that [Plaintiff] is capable of sustaining an ordinary routine without special supervision. Dr. Link noted that [Plaintiff] is independent and gives care to a baby, and that she is capable of all activities. Dr. Link concluded that [Plaintiff] is able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment.

R. 26 (internal citations omitted). The ALJ concluded with respect to Dr. Link that: "[t]his opinion is well supported by the medical evidence of record as a whole and is afforded significant weight." R. 26.

The ALJ next discussed a psychiatric evaluation conducted on March 8, 2010 at Stairways Behavorial Health wherein Plaintiff was determined to have a GAF score of 43. The ALJ concluded that this assessment was "indicative of serious symptoms" and "runs counter to the weight of the evidence, including the examiner's own report." R. 26. In support of this conclusion, the ALJ reasoned: "Initially, the findings reported in this evaluation are based entirely on [Plaintiff's] subjective reporting and not on past medical findings or any type of longitudinal history of treatment. Secondly, the mental status examination was essentially normal. Finally, the diagnosis from this evaluation was the generic unspecified episodic mood disorder." R. 26. Thus, the ALJ concluded: "[t]his combination of factors, together with the other evidence of record, does not support a GAF assessment of 43." R. 26. The ALJ further concluded that:

> a low GAF score, by itself, is not necessarily indicative of an impairment seriously interfering with a claimant's ability to work. The residual functional

capacity adopted herein has properly assessed and considered all of the [Plaintiff's] limitations, based upon the record as a whole. No one particular piece of evidence may be viewed in isolation. A GAF score represents a snapshot of an individual's level of functioning at a particular time, and is a highly subjective rating scale. The remainder of the records of claimant's treatment reveals minimal findings. The credibly established limitations resulting from claimant's mental impairments are sufficiently accommodated by the above defined residual functional capacity.

R. 26.

The ALJ next discussed the opinion evidence of Kelly Weary, the certified registered nurse practitioner at Stairways Behavorial Health. The ALJ explained that Ms. Weary had completed a form on August 6, 2010 in which she checked "yes" or "no" to four questions. Specifically, Ms. Weary had checked "no" to the first three questions on the form, and "indicated that [Plaintiff] is incapable of maintaining concentration or attention on a regular and continuing basis, maintaining regular attendance, interacting appropriately with fellow workers and supervisors and responding appropriately to supervisory criticism." R. 26. Ms. Weary then checked "yes" to the final question which explained that "her opinion [was] based upon observation of the [Plaintiff], clinical history, and review of signs and symptoms." R. 26. Ultimately, the ALJ explained, while he considered Ms. Weary's opinion consistent with SSR regulations, he gave little weight to Ms. Weary's opinion because he found that the basis of her opinion was undisclosed, there was no accompanying explanation, the opinion was against the weight of the medical evidence of record, it was unclear if her determination of disability met the 12-month durational requirement for a finding of disability under the Social Security Regulations, and she "is not an acceptable medical source under 20 CFR 404.1513 and 404.913." R. 26.

Thus, the ALJ concluded, his residual functional capacity assessment was "supported by the opinion of Dr. Link, the ongoing treatment records from Stairways Behavorial Health, other than the opinion offered by Nurse Weary as discussed, and the medical and non-medical evidence contained in the overall longitudinal record." R. 27.

The ALJ then went on to conclude that Plaintiff was capable of performing her past relevant work as a housekeeper because this work does not require the performance of work-related activities that are precluded by her residual functional capacity as found by the ALJ. R. 27. "In comparing the [Plaintiff's] residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed." R. 27.

The ALJ then determined that in addition to working as a housekeeper, there were other jobs existing in the national economy that Plaintiff also was able to perform. R. 27. In so finding, the ALJ explained that he "asked the vocational expert whether jobs exist in the national economy for an individual with the [Plaintiff's] age, education, work experience, and residual functional capacity." R. 28. The ALJ then explained that the vocational expert testified that such an individual "would be able to perform the requirements of representative occupations such as surveillance system monitor at the sedentary exertional level with 115,000 jobs existing in the national economy, document preparer at the light exertional level with 300,000 jobs existing in the national economy, and bench assembler at the medium exertional level with 300,000 jobs existing in the national economy." R. 28.

The ALJ then concluded, "[b]ased on the testimony of the vocational expert," that "considering the [Plaintiff's] age, education, work experience, and residual functional capacity,

the [Plaintiff] is capable of making a successful adjustment to other work that exists in the national economy" and therefore, a finding of "not disabled" under section 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act was appropriate. R. 28.

## V. Medical and other Records.

### A. The Medical Group of Corry, Inc.

Medical records from the Medical Group of Corry, Inc. ("MGC") show that Plaintiff went to medical practice on numerous occasions from March 27, 2008 until March 19, 2009. R. 315. As of March 27, 2008, Plaintiff was taking 10 mg of Lexapro, an anti-depressant. R. 313.

A treatment note from April 22, 2008 indicates that Plaintiff "[d]enies depression" and was taking Lexapro. R. 311. A treatment note from April 22, 2008 indicates that Plaintiff "[d]enies depression." R. 308. A treatment note from April 29, 2008 indicates that Plaintiff was taking Lexapro. R. 307. A treatment note from May 20, 2008 indicates that Plaintiff was taking Lexapro. R. 301. A treatment note from May 29, 2008 indicates that Plaintiff "[d]enies depression" and was taking Lexapro. R. 298. A treatment note from June 16, 2008 indicates that Plaintiff's Lexapro prescription was refilled. R. 296. A treatment note from July 1, 2008 indicates that Plaintiff "[d]enies depression" and was taking Lexapro. R. 292.

A treatment note from September 10, 2008, when Plaintiff went to MGC related to her obesity, indicates that Plaintiff "reports depression." R. 289. Plaintiff's Lexapro prescription was refilled and the assessment included "Depressive Disorder Not Elsewhere Spec[ified]." R. 290.

A treatment note from October 6, 2008 indicates that Plaintiff was taking Lexapro. R. 285.

On October 27, 2008, treating physician's assistant Mary Evelyn Pifer, RPA-C, wrote a "To whom it may concern" letter that stated: "PT HAS A HISTORY OF DEPRESSION. PT IS CURRENTLY BEING TREATED." R. 284.

At her November 13, 2008 appointment at MGC, the nurse's note indicated the visit was for a follow-up of Plaintiff's depression. R. 282. It was noted that: [c]ondition has been worsening since last visit. Present for awhile. Onset being gradual following social issues. Appetite is poor. Patient has difficulty falling asleep and patient has difficulty staying asleep." R. 282. Plaintiff also reported anxiety, mild crying, poor energy level, feeling moderately overwhelmed, moderate racing thoughts, moderate sadness, moderate insomnia, associated difficulty concentrating, fatigue, stress and excessive worry. R. 282. Plaintiff denied associated frequent crying, change in sex pattern and suicidal thoughts. R. 282. On exam it was noted Plaintiff displayed anxiety, depression, and sadness. R. 282. Her affect was depressed, her thought processes appeared normal, there were no delusions or hallucinations, her memory was intact, and her attention span and concentration were normal. R. 282. Her Lexapro prescription was increased from 10 mg to 20 mg. R. 283. Assessment included "Depressive Disorder Not Elsewhere Spec[ified]." R. 283.

At her December 10, 2008 visit to MGC, the nurse's note indicates that Plaintiff was there for follow up of her depression and forms. R. 279. Plaintiff's "[m]ood is normal. Affect is normal. Memory is intact." R. 280. She was "[a]lert and oriented x3." R. 280. She was taking Lexapro. R. 278. Assessment included "Depressive Disorder Not Elsewhere Spec[ified]." R. 280. That same day, Ms. Pifer, the treating physician's assistant, filled out 2 forms for Plaintiff. First, she completed a Health-Sustaining Medication Assessment Form wherein she indicated

that in order for Plaintiff to be employable or continue with employment she needs Lexapro to help stabilize moods. R. 231. She also completed a state Medical Assessment Form wherein she indicated that Plaintiff suffered from depression, back pain and bilateral feet pain, that Plaintiff was following a prescribed treatment plan, and that she was able to work without any accommodations. R. 233-234.

Plaintiff returned to MGC on January 7, 2009 to follow-up on her depression. R. 275. The nurse's note from the visit states "[c]ondition has been mostly well controlled since last visit. Present for awhile. Onset being gradual following financial stresses and home related s/s. The note indicates that Plaintiff's appetite was unchanged, she had difficulty staying asleep, she reported her depressed feelings to be fair, reported memory loss and associated difficulty concentrating, fatigue, stress and excessive worry, but denied associated frequent crying, change in sex pattern, anxiety, insomnia, and suicidal thoughts. R. 275. On exam, no signs of apparent distress were noted, Plaintiff displayed depression during the encounter, her affect was depressed, her thought processes appeared normal, and she did not have delusions, hallucinations, obsessions or preoccupations. R. 275. She was told to continue taking Lexapro; her assessment included "Depressive Disorder Not Elsewhere Spec[ified]." R. 26.

Also on January 7. 2009, Ms. Pifer wrote a "To whom it may concern" letter wherein she stated: "PT IS CURRENTIY UNEMPLOYED DO [sic] TO MEDICAL CONDITIONS." R. 277.

At a January 30, 2009 visit for MGC, when Plaintiff was at the doctor's office for a re-check of low back pain, she "denie[d] depression" and it was noted that her affect and mood were normal and her memory intact. R. 262-263.

Plaintiff was seen again on January 16, 2009 for back pain. R. 269. It was noted that she was taking the Lexapro. R. 269.

She was seen again at MGC on numerous visits between January 19, 2008 and January 27, 2008; each time her Lexapro use was noted. R. 264-267.

On January 30, 2009, Plaintiff went to MGC for a re-check of her low back pain. R. 260. There is no mention of her using Lexapro, but she was taking Citalopram, another anti-depressant, and her mood and affect were normal. R. 260.

Plaintiff returned to MGC on February 13, 2009 for a re-check for depression. R. 259. It was noted that Plaintiff presented with depression and that "condition has been improving since last visit. Present for awhile. Appetite is good. Sleep pattern is good. Reports concentration is poor. Denied crying. Reports irritability. Denied feeling overwhelmed. Reports associated difficulty concentrating and stress, but denied associated frequent crying, fatigue, change in sex pattern, suicidal thoughts and excessive worry." R. 258. She also denied anxiety. R. 258. On exam it was noted that Plaintiff's mood, affect, thought processes, attention span and concentration were normal, memory was intact, and judgement and insight were grossly intact. Her use of Citalopram was noted and the assessment included "Depressive Disorder Not Elsewhere Spec[ified]." R. 259. She was told to continue taking her current medications. R. 259.

On February 13, 2009, Ms. Piper again filled out a state Medical Assessment Form; this time she indicated that Plaintiff was following a prescribed treatment plan and was temporarily incapacitated from participating in any form of employment or training activity from December 29, 2008 until, Ms. Piper expected, June 29, 2009, due to depression and lumbago. R. 229-230.

18

Plaintiff returned to MGC on February 24, 2009 due to fatigue and abdominal pain. R. 254. Her use of Citalopram was noted. R. 255. It also was noted that Plaintiff's affect was normal. R. 256. Plaintiff was seen again at MGC on March 11, 2009 for a possible UTI. R. 252. She was seen again on March 19, 2009 complaining of abdominal pain. R. 249. Her affect was normal. R. 250.

Plaintiff was treated at MGC on March 11, 2009 for a possible UTI. R. 252. Her use of Citalopram was noted. R. 251.

Plaintiff's final treatment note from MGC is dated March 19, 2009 when she presented with abdominal pain. R. 248. It was noted that her affect was normal and she was using Citalopram. R. 249 and 250.

### B. Counseling Services Center – Corry.

The first record of Plaintiff going to Counseling Services Center – Corry ("CSC") and being seen by Dr. Hridayesh Pathak, M.D., a Psychiatrist, is from May 13, 2006. R. 327. At that time, Dr. Pathak wrote a detailed Psychiatric Evaluation on Plaintiff, noted her "psychomotor activity is within the normal range," "[h]er mood is fairly euthymic," and "[h]er cognitive functions are intact and insight and judgment is good;" he diagnosed Plaintiff with Major Depressive Disorder Recurrent, Moderate, without Psychotic Feature, noted Partner Relational Problems and Severe Psychosocial Stressors, that being interaction with court and legal system, and gave her a GAF of 55.[1] R. 329-330. Dr. Pathak increased her Effexor prescription to 150 mg, noting that the dose had been very helpful in the past. R. 333.

---

[1] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 34 (4th ed. 2000). Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial

Dr. Pathak's partner was Dr. Asha Prabhu, M.D., also a Psychiatrist. Records from CSC's office show Plaintiff was again seen in their office on May 8, 2006, May 12, 2006, July 11, 2006, and August 30, 2006. Plaintiff missed appointments at the office on June 2, 2006, June 8, 2006, June 19, 2006, June 21, 2006, August 1, 2006, August 2, 2006, and August 8, 2006.

On May 13, 2009, approximately 3 years after her last visit to CSC, Plaintiff began to be treated again by Dr. Prabhu. On that date, Plaintiff's chief complaint was that "I am having my depression which is really bad." R. 327. Plaintiff explained that she has been depressed since 2000, but recently the depression was getting worse. R. 327. Her stressors were separation from her husband for one month, not seeing her children, and financial stressors. R. 327. She also explained that she was getting very anxious and had a lot of crying spells, irritability, getting very short tempered, forgetful and not sleeping and not eating. R. 327. She had feelings of helplessness and hopelessness. R. 327. She also stated that she felt very restless and gets overwhelmed. R. 327. She denied any paranoia, auditory or visual hallucinations and did not have OCD symptoms. R. 327.

Plaintiff explained to Dr. Prabhu that she was currently taking on-line college courses for an associate business degree, and that she had had to quit her last job "otherwise they would not give her son back." R. 327.

Dr. Prabhu noted that Plaintiff was oriented to person, place, and date, her mood was depressed and her affect was blunted, her memory times three was intact, serial 7, she could only go down to 93, abstract thinking was intact, her concentration was fine, her intelligence was average and her insight and judgment were intact. R. 327. Dr. Prabhu's diagnoses were major

---

speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers." Id.

depressive disorder, recurrent episode, mode, and moderate to severe psychosocial stressors. R. 328. He gave her a current GAF score of 50.[2] R. 328. He noted that Plaintiff was getting individual therapy and recommended that continue. R. 328. He also increased her Celexa (Citalopram) from 20 mg to 30 mg. R. 328

Plaintiff returned to see Dr. Prabhu on July 29, 2009. R. 359. She told Dr. Prabhu that she gets irritable and tense. R. 359. Dr. Prabhu indicated that Plaintiff's mood was euthymic and stable during the visit. R. 359. He increased her Celexa from 30 mg to 40 mg due to her irritability. R. 359.

Plaintiff saw Dr. Prabhu again on November 11, 2009. R. 358. Dr. Prabhu indicated that Plaintiff came in stating she was "feeling great," denied any side effects from taking the Celexa, had a new job where she was working 40 hours a week, and was working on her relationship between herself and her husband. "She denies any feelings of helplessness, hopelessness. Her mood was euthymic and her affect was stable. She did have me fill out a paper that she is going to get gastric bypass surgery, so I did feel she was doing well and she was appropriate for it." R. 358. His impression was "Major Depression in Remission." R. 358. His recommendations were for her to continue on the Celexa and to continue therapy.

Plaintiff next saw Dr. Prabhu on February 3, 2010. R. 358. Dr. Prabhu indicated that Plaintiff stated that she cannot sleep, she is getting very anxious, sometimes just snaps out at her kids, she is getting stressed out, but otherwise things are ok between her and her husband. R. 358. Dr. Prabhu observed that Plaintiff's mood was tense and she was slightly irritable. His

---

[2] An individual with a GAF score of 41 to 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.

assessment was Major Depression. R. 357. He increased Plaintiff's Celexa from 40 mg to 60 mg and added Vistaril 25 mg. R. 357. This is the last treatment note in the Record from CSC.

### C. Stairways Behaviorial Health.

On March 3, 2010, Plaintiff presented to Stairways Behaviorial Health and was seen by Dr. Matt Meyer, D.O. for a psychiatric evaluation. R. 363. Dr. Meyer explained that Plaintiff presented with chief complaints of depression, mood swings, decreased concentration, auditory hallucinations and "dissociative states." R. 363. He also indicated that Plaintiff told him that she has been suffering from mood disturbances for most of her life, but feels that they have gotten pretty severe over the past six months. R. 363. She explained that she lost her job in December 2008, she has significant issues surrounding her husband and her children and she is crying daily. R. 363. Plaintiff also indicated that she does have occasional suicidal thoughts, but no plans, and no intent and would not harm herself because of her children. R. 363. Plaintiff further indicated to Dr. Meyer that she does not like to leave the house, she tends to isolate herself, she thinks a lot about death, and she has some paranoia: "This is tied very closely to her anxiety." R. 363. Dr. Meyer noted that Plaintiff has auditory hallucinations daily which are in the form of hearing people trying to talk to her. R. 363. He also noted that Plaintiff has been suffering from maintenance insomnia, sleeping around 5 hours at the most during the night and her appetite was decreased. R. 363. Dr. Meyer noted that she has significant problems with her husband and that while Plaintiff had four children only one lived with her. R. 363.

At the time Plaintiff saw Dr. Meyers she was only taking Prilosec. R. 363. She indicated that she had also taken Celexa (Citalopram), Cymbalta and Effexor in the past and that she does

not feel that they have helped her. R. 363. She also explained that she'd been prescribed Vistaril, but never took it. R. 363.

Dr. Meyers relayed that Plaintiff had told him that she was not currently working, was collecting disability, last worked on December 29, 2008 when she lost her job because of not showing up to work, having mood swings, and too many external stressors to care about work. R. 364.

Dr. Meyer's impression of Plaintiff was that she was alert and oriented to person, place and time and was cooperative. R. 364. She made appropriate eye contact and has adequate hygiene. R. 364. She showed no signs of psycho motor retardation, her speech was spontaneous at a regular rate of rhythm, her thought processes appeared to be logical and coherent without any signs of internal preoccupation or loosening associations. R. 364. She had auditory hallucinations in the form of hearing voices, but realizes that there is no one there. She does admit to mild paranoia, but does not appear delusional. R. 364. Dr. Meyer found her judgment and insight to be fair to poor. R. 364. He found her mood was currently euthymic with a history of being irritable, and that her affect was currently euthymic. R. 364. He further explained that Plaintiff stated that she had significant problems with her memory and concentration and she has periods of "spacing out." R. 364.

Dr. Meyer diagnosed Plaintiff with Unspecified Episodic Mood Disorder, unspecified Hyperkinetic Syndrome of Childhood, Borderline Personality Disorder, listed her Axis IV (Severity of Psychosocial Stressors) as severe, and rated her current GAF at a 43. R. 364. Dr. Meyer recommended Plaintiff see an individual therapist and noted one was scheduled for March 18, 2010. R. 364. He started her on Prozac for her depressive mood, Abilify as an adjunct, to

23

help her with her auditory hallucinations, and Strattera to help with her concentration, focus, and memory. R. 364.

Plaintiff was next seen by Dr. Meyer on April 9, 2010. R. 362. Under Nursing Review it was noted that Plaintiff had difficulty falling asleep and frequent awakening, she was sleeping between 4 and 5 hours a night, her back pain was an eight, she was going to see a physical therapist 2 days a week, and with respect to her current mental health issues: "Doesn't feel anything is changed. Depressed, easily agitated. Very tearful. Mood swings and racing thoughts, no energy. Difficulty even getting to appts. Focus and concentration poor. Falling behind with on-line schooling. Can't sit and when she does sit down she can't focus. Not taking Strattera [because] wasn't covered by insurance." R. 362. Under Physician Section it was noted that Plaintiff's motor activity, speech, sensorium, behavior, thought content, thought flow, affect, judgement, illness insight, and extra pyramidal were within normal limits, her mood was depressed and anxious and her anxiety state was mildly elevated. R. 362. Dr. Meyer indicated that Plaintiff was not stable on current psychotropic medications, Plaintiff had told him she could not get her Strattera prescription filled, she felt nothing from other medications, she was getting agitated easily with others. R. 362. His plan was to increase her Prozac and Abilify before considering another medication. R. 362.

Plaintiff was next seen by Dr. Meyer on May 7, 2010. R. 361. Under Nursing Review it was noted that Plaintiff suffered from frequent awakening and complained of broken sleep, and being up at night at least three times. R. 361. Her back pain had decreased to a six and she was seeing a physical therapist. R. 361. With respect to her current mental health issues it was noted that Plaintiff had been off Abilify for one week because it was giving her nightmares. She did not

24

have any side effects from the Prozac but her irritability had increased, she was exploding at people, had heavy mood swings, and was paranoid and nervous "all the time." R. 361. She can't sit still, wants to constantly be doing something, or going somewhere but admitted to staying home more. R. 361. She does enjoy being by herself and has weeks she doesn't want to see or be around people she has to be with. R. 361. In terms of school, Plaintiff had explained that she does a lot of reading but can't stay focused and isn't comprehending what she is to learn. R. 361. Under Physician Section it was noted that Plaintiff's motor activity, speech, sensorium, behavior, anxiety state, thought content, thought flow, and extra pyramidal were within normal limits. R. 361. Her mood was listed as irritable, her affect was anxious, her judgement and illness insight were considered fair, and she was not stable on current psychotropic medications. R. 361. Dr. Meyer's Notes said Plaintiff was still reporting difficulty concentrating on her school work, she had stopped the Abilify on her own due to nightmares, he gave a probable diagnosis of ADHS, predominantly inattentive type, he was going to try to get Strattera approved for Plaintiff, Plaintiff reported irritability and he was going to start her on Risperdal .5 mg for two months. R. 361.

Plaintiff was next seen at Stairways Behavorial Health on May 26, 2010 by Kelly Weary, a Certified Registered Nurse Practitioner ("CRNP"). R. 360. Under Nursing Review it was noted that Plaintiff suffered from frequent awakening from sleep, she was sleeping 3 hours max, she was not in pain, and Plaintiff reported that she is unable to stay asleep, she has extreme itchiness in her head, she is having problems with anger, and she had not hit anyone but gets extremely irritated. R. 360. Ms. Weary noted that Plaintiff was medication compliant but had stopped taking the Risperdal due to bad stomach pains. R. 360.

25

Under Physician Section it was noted that Plaintiff's motor activity, speech, sensorium, thought content, judgement, illness insight, and extra pyramidal were within normal limits, and that her mood was listed as anxious, her anxiety state was mildly elevated, she was having auditory hallucinations, her affect was anxious, and she was not stable on current psychotropic medications. R. 360. Under Notes, Ms. Weary reported Plaintiff had stopped Risperdal due to gastrointestinal symptoms, had not started taking Adderall yet, and reported irritability, anger-rage, throws things, "flys off the handle," and hearing her name called. R. 360. Ms. Weary educated Plaintiff on Geodon, a new medication Plaintiff was prescribed. R. 360.

Plaintiff called the office on May 28, 2010 wanting to talk about her taking the Adderall. R. 377. Plaintiff again called into the office on June 1, 2010, stating she has been taking the Adderall, couldn't sleep, and was having racing thoughts, "ten times worse than before." R. 378. Plaintiff was told to hold off taking the Adderall until she met with Dr. Meyer on July 2, 2010, but to keep taking the Geodon. R. 378.

Plaintiff missed her appointment with Dr. Meyer on July 2, 2010 and was not seen again at Stairways until July 20, 2010 when she was seen by Ms. Weary. R. 376. Plaintiff was still having problems with frequent awakening at night and she was sleeping 5 hours per night. R. 376. Her appetite had decreased and her weight had increased. R. 376. Plaintiff indicated that "she is having too many days 'where I think I am going insane'." R. 376. Plaintiff told Ms. Weary that she has a lot of stress from her husband, no patience, is snapping, getting angry easily, depressed, and feeling overwhelmed. R. 376. She also felt the Geodon was not doing what it should for her mood. R. 376.

Under Physician Section it was noted that Plaintiff's motor activity, speech, sensorium, behavior, thought content, judgement, illness insight, and extra pyramidal were within normal limits, that her mood was depressed and anxious, her anxiety state was mildly elevated, she was having auditory hallucinations, her affect was flat, and she was not stable on current psychotropic medications. R. 376.

Under Notes, Ms. Weary indicated that Plaintiff reported: (1) that the trial of Adderall XR did not go "well'' 'made everything worse';" (2) poor sleep, irritability, racing thoughts, anxiety, and auditory hallucinations – no commands; and (3) high stress with husband, emotional abuse, is considering separation which "will take a few months." R. 376. Ms. Weary indicated that Plaintiff was to discontinue taking Adderall, continue Prozac, increase Geodon, add Trazodone for mood and sleep, and continue [individual counseling]." R. 376.

Plaintiff was seen that same day by Linda Graves, a licensed social worker, who wrote a Treatment Progress Review. R. 375. Plaintiff's objectives were listed and it was noted that "[plaintiff] has not attended IC since 5/7/10. At that last session, she reported increased irritability and difficulties with concentration. She was starting Strattera per her doctor. Therapist had introduced the concept of managing mood through cognitive strategies, but [Plaintiff] has not returned to assess her progress with this." R. 375.

Plaintiff was next seen at Stairways Behavorial Health on August 4, 2010 by Ms.Weary. R. 374. Under Nursing Review it was noted that Plaintiff suffered from frequent awakening from sleep, she was sleeping 6 hours per night, she gets up once or twice per night, her appetite was within normal limits, no pain was observed or reported, and Plaintiff reported that she still has racing thoughts, her "head is constantly rolling," she remains irritable but feels the anxiety may

have lessened slightly, feels increased "hopelessness," she was looking into couples counseling, and had been in the emergency room for a migraine, where her blood pressure was very high. R. 374.

Under Physician Section it was noted that Plaintiff's motor activity, speech, sensorium, behavior, thought content, judgement, and extra pyramidal were within normal limits, that her mood was anxious, her anxiety state was mildly elevated, her affect was anxious, her illness insight was fair and she was not stable on current psychotropic medications. R. 374.

Under Notes, it was stated that Plaintiff reported she had been sleeping better, and feeling less anxious but still had daily anxiety, high level of irritability and racing thoughts. R. 374. Plaintiff also reported she had had fatigue, which she related to anemia and B-12 deficiency. R. 374. Plaintiff felt she was tolerating the morning dose of Geodon so decision was made to increase the morning dose of Geodon to 40 mg., continue her other medications, and continue individual counseling. R. 374.

On August 6, 2010, Ms. Weary completed a form with respect to Plaintiff that had been sent to her from Plaintiff's attorney. The form explained:

> The issue in a Social Security disability/SSI case is whether the claimant would be able to meet the mental demands/stressors of competitive employment on a regular, continuing and sustained basis – for 8 hours per day and for 5 days per week. Even if a mentally-ill claimant's mental condition is deemed to be stable, such stability is viewed in the context of a non-work setting. The demands/stressors of competitive employment include maintaining regular attendance, maintaining concentration, reacting appropriately to supervisory criticism, interacting appropriately with others, handling deadlines/schedules etc. In your professional opinion, would the above patient be able to meet the following mental demands of competitive employment on a regular, continuing, and sustained basis:

R. 373. Four questions then followed. R. 373. The first three questions were: (1) "Would the above patient be capable of maintaining concentration/attention of a regular and continuing basis?; (2) "Would the above patient be capable of maintaining regular attendance?; and (3) "Would the above patient be capable of interacting appropriately with fellow workers and with supervisors and responding appropriately to supervisory criticism?". R. 373. Ms. Weary answered "no" to all three of the questions. The final question asked "[a]re your responses based upon observation of the patient, clinical history, and review of signs/symptoms?" R. 373. Ms. Weary answered "yes." R. 373.

### D. Function Report completed by Plaintiff.

On April 9, 2009, Plaintiff completed a Function Report wherein she described her activities of daily living to be: "I get up get dressed [and] use the restroom. Get my son out of bed change him dress him [and] take him to daycare. Then I come back home [and] make sure my house is clean. I pick my son up at 4:30 pm [and] come home. Make dinner, feed him, clean up give him a bath and put him to bed at 8:00. I then take a shower, relax, and by 10:00 pm go to bed." R. 186. She also indicated that she had one dog that fed daily and tied her out. R. 187. She also explained that her parents helped her with her son "quite a bit. They help change him feed him, bath him, dress him, etc." R. 187. She also indicated that she could dress, bathe, care for her hair, prepare her own food daily albeit more simple items, feed herself and use the toilet; she usually didn't shave because she did not feel she had any reason to, which could be embarrassing, and she needed to be reminded to take her medication. R. 187-188. She also cleaned and did dishes daily and laundry and cleaning up after the dog weekly. R. 188. Finally, she noted that she went outside daily to do errands and take her son to daycare, and that when

29

she went out, she could go out alone and would drive a car. R. 189. When she would go shopping, she would do it typically twice a month for about an hour maximum. R. 189. She indicated that she can pay bills, count change, and handle a savings account, but that she cannot use a checkbook/money orders without errors being made. R. 189.

Plaintiff listed her hobbies to be sewing, playing games, horses and watching movies, but then qualified her response to be that she watches t.v. a lot but hardly does any of the others due to her depression becoming worse. R. 190. She also indicated that she does not spend time with others and doesn't normally go anywhere unless she has to, but that when she does got out, she does not need someone to accompany her. R. 190. She further explained that she no longer hangs out with friends or goes on social outings. R 191. She also indicated: '[t]he depression has gotten to where I don't remember things complete any task on time or concentrate on anything. R. 191. She opined that she can pay attention for ten minutes "if your lucky," she does not finish what she starts, she does not follow written directions well, and follows spoken instructions fairly well, but not as well as she used to. R. 191. She indicated that she got along fairly well with authority figures, she had never been fired or laid off from a job because of problems of getting along with others, and she does not handle stress well at all. R. 192.

**VI. Legal Analysis.**

In support of her Motion for Summary Judgment, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to address all of the relevant medical evidence in the Record in determining her residual functional capacity; he improperly evaluated the opinions of non-examining state agency psychologist Dr. Manella Link, Ph.D, and treating certified registered nurse practitioner Kelly Weary; and he improperly evaluated

Plaintiff's credibility. See Plaintiff's Supporting Brief, pp. 7-24. To the contrary, in support of the Defendant's motion for summary judgment, the Commissioner of Social Security contends that the ALJ's decision that Plaintiff is not disabled under the Social Security Act is supported by substantial evidence. See Defendant's Supporting Brief, pp. 12-21.

When determining a claimant's residual functional capacity, an ALJ must consider all of the relevant evidence. Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2001). Relevant evidence includes "descriptions and observations of your limitations from your impairments(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons." 20 C.F.R. § 416.945(a)(3). The ALJ must reach specific findings regarding all pertinent medical evidence and reconcile any conflicts. Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 126 (3d Cir. 2000). If any particular evidence is rejected, the ALJ must provide an explanation. Id. at 126. The ALJ's residual functional capacity finding must be accompanied by a "clear and satisfactory explication of the basis on which it rests." Fargnoli, 247 F.3d at 41 (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981)).

We agree with Plaintiff that the ALJ failed to consider all of the medical evidence relevant to Plaintiff's mental health issues in determining Plaintiff's residual functional capacity. In particular, the ALJ failed to discuss the May 2009 psychiatric evaluation wherein treating psychiatrist Dr. Prabhu evaluated Plaintiff's mental health and found her current GAF to be a 50. An individual with a GAF score of 50 may have "[s]erious symptoms (e.g. suicidal ideation. . . .)" or "impairment in social, occupational, or school function (e.g. no friends, unable to keep a job). American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders

(DSM–IV–TR) 34 (4th ed. 2000). As explained in <u>Gallagher v. Astrue</u>, 2012 WL 2344455, *10 (W.D. Pa.):

> [w]hile a claimant's GAF score is not generally considered to have a "direct correlation to the severity requirements of the ... mental disorder listings," it remains the scale used by mental health professionals to "assess current treatment needs and provide a prognosis." <u>Sweeney v. Comm'r of Soc. Sec.</u>, 2012 WL 749376 at *4 (W.D. Pa.) (<u>quoting</u> 65 F.R. 50746–01, 50764–65). As such, "it constitutes medical evidence accepted and relied upon by a medical source and *must* be addressed by an ALJ in making a determination regarding a claimant's disability." <u>Watson v. Astrue</u>, 2009 WL 678717 at *5 (E.D. Pa.) (emphasis in original) (citation omitted). While the ALJ is free to accept some parts of the medical evidence and reject others, he must consider all evidence and provide an explanation for discounting rejected evidence, particularly when that evidence would suggest a contrary disposition. <u>Adorno v. Shalala</u>, 40 F.3d 43, 48 (3d Cir. 1994).

<u>Id.</u> at *10. <u>See also</u> <u>Williams v. Colvin</u>, 2014 WL 66360, *2 (W.D. Pa.) (citing <u>Rios v. Commissioner of Social Sec.</u>, 2011 WL 4059780, *2 (3d Cir.2011), <u>citing</u>, 65 Fed.Reg. 50746–01, 50764–65 (2000)) (court acknowledged "that GAF scores do not have a 'direct correlation to the severity requirements' of the Social Security mental disorder listings'," but further concluded that "they are medical evidence that informs a Commissioner's judgment in assessing whether an individual is disabled.).

Furthermore, while the ALJ concluded "[a]lthough the severity of her symptoms does fluctuate, the overall treatment record reflects a fairly well-controlled condition that is responding reasonably well to medication," R. 24, a review of the Record shows that each of the five (5) times Plaintiff was seen at Stairways from April 2010 to August 2010, she was found to not be stable on her medications and the medication prescribed was either increased or changed to a different medication altogether. <u>See</u> R. 360 – 362, 374-376.

Finally, part of the reasoning behind the ALJ's disregard of Dr. Meyer's finding that Plaintiff had a GAF of 43 on March 8, 2010 was that "the mental status examination was essentially normal" and that "the diagnosis from the evaluation was the generic unspecified episodic mood disorder. " See. R. 26. In so concluding, the ALJ failed to discuss that at the time of the evaluation, Plaintiff reported having auditory hallucinations, the result of which was that Dr. Meyers prescribed Abilify as an adjunct to help her auditory hallucinations, and he found her judgment and insight to be fair to poor. R. 364. Additionally, Dr. Meyers diagnosed Plaintiff not only with "Unspecified Episodic Mood Disorder," but also with "unspecified Hyperkinetic Syndrome of Childhood, [and] Borderline Personality Disorder." R. 364. We are also concerned that the ALJ disregarded Dr. Meyer's assessment in part on the basis that "this assessment runs counter to the weight of the evidence, including the examiner's own report, and yet he failed to cite specifically to one piece of medical evidence in the Record in support of this conclusion other than his generic reference to "the examiner's own report" which we have just concluded the ALJ did not properly evaluate. See Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) (citations omitted) (concluding that while an ALJ may reject a treating physician's assessment, he may do so "'outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion.")

In light of our conclusion that the ALJ failed to consider all of the relevant medical evidence in determining Plaintiff's residual functional capacity, we must conclude that there is not substantial evidence to support the ALJ's conclusion that Plaintiff retained the residual functional capacity to perform her past job as a housekeeper, and that the Commissioner's

motion for summary judgment must be denied. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Plummer, 186 F.3d at 427.

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.' " Morales v. Apfel, 225 F.3d 310, 317 (3d Cir.2000) (quoting Smith, 637 F.2d at 970). A claimant attempting to secure benefits under the Act must establish that both her medically determinable impairment (or combination of impairments) and her inability to work have lasted (or are expected to last) for the statutory twelve-month period. Barnhart v. Walton, 535 U.S. 212, 214-222 (2002). Here, we find that Plaintiff has not established on the existing Record that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." See Ambrosini v. Astrue, 727 F.Supp.2d 414, 432 (W.D. Pa. 2010) (an immediate award of benefits is justified only where "the evidentiary record has been fully developed," and where "the evidence as a whole clearly points in favor of a finding that the claimant is statutorily disabled."). Accordingly, the Plaintiff's motion for summary judgment must be denied to the extent it seeks the reversal of the Commissioner's decision and an award of benefits in her favor. Plaintiff's motion for summary judgment will, however, be granted to the extent it seeks a remand of this matter back to the ALJ for further

consideration of Plaintiff's application for disability insurance benefits and supplemental security income benefits. [3]

An appropriate Order will follow.

Date:   April 2, 2014

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.
Senior United States District Judge

---

[3] In light of this determination, it is not necessary to address Plaintiff's remaining arguments in support of her motion for summary judgment and we elect not to do so.